May it please the Court, P. Joseph Sandoval for the Petitioner. I'd like to reserve two minutes for a rebuttal. Your Honors, this case is about past persecution and the realities of the trial courts that we're now seeing in the immigration context. Petitioners are going in, aliens are going in, exaggerating, not telling the truth, they're not credible. In this case, the Petitioner was credible. The immigration judge found that the Petitioner testified consistently, internally as well as consistently with the documents that were submitted in the record of proceedings. In fact, the immigration judge found that she had met the first prong, the subjective standard of the reasonable fear, and that was credible. Immigration judges are now hearing fabricated cases, cases that are extremely exaggerated, and the bar is getting raised higher and higher and higher, so that now the reality of the trial court is that in order to prevail, you have to show that you've been raped, that there has been mayhem, and if the judge doesn't hear that, then it doesn't rise to the level of persecution. In fact, here the judge said, you were not injured, therefore it doesn't rise to the level of persecution. The Board of Immigration Service said, you were not injured, therefore it does not rise, and they disregard the fact that there was a pattern and practice of persecution and discrimination against people similarly situated to the Petitioner, and this could in fact rise to the level of persecution. Here, in May 12th of 1998, there were three days of riots in Indonesia that were focused on Chinese. Petitioner is Chinese. She felt that she was... Let me ask you there for a second. If we take away your argument about pattern and practice, do you concede that there would not be past persecution evidence, in this case, sufficient for a finding of past persecution? No, we don't concede that, and the past persecution would have been the fact that she was at ground zero of this riot. She was placed in substantial fear of substantial bodily injury. Chinese women were being raped. Businesses were being... Right, but what I understand, what happened to her was two things. One, she received a threat that Chinese must die in the context of a limo driver or somebody. The second thing is she was present in a church that was bombed while she was there, right? We would say definitely those two, and then potentially a third, which was being in Jakarta during the time of the riots, hiding in her house for three days, asking for the protection of her brother, so that she herself would not experience the same types of terrible acts that were being brought upon other women similarly situated to her. So she was at ground zero of sorts. Right, but how does avoidance of past persecution... Pardon? How can avoidance of persecution constitute persecution? I mean, I may go to your past pattern and practice argument, but... Anyway, what's your... It's an interesting case in the sense that she didn't suffer any physical injuries and she has one threat. I think the threat standing alone wouldn't be enough. The question is, so the bombing of a church where you're present constitute enough of a past persecution. What's your best case on that? We believe that the strongest case and the strongest argument for that is that she was in a church that was being assaulted, being burned. There was definitely a significant chance that she may have been killed. And there was a subjective, a credible subjective belief on her part that she was going to be injured during that circumstance. It was enough that there was a possibility that she may have died in that church as it was being burned. And again, the immigration judge found that her testimony was credible. We're to assume that in fact it did happen, that the church was being burned and that she was in a position of substantial risk to her own safety. And we believe that that would be enough subjectively to support her fear. And then also objectively. Somebody's experience in 9-11 watching what was happening on TV here in the United States is certainly different from somebody living in New York and certainly different from somebody actually being in the towers or going to work on that day. The closer you come to that ground zero, the more horrific it is, the more terrifying it is. The more, in this case, that she was there, not only in the riots, the three-day riots that happened in Jakarta, but in the church, places her in a position that is much different from, say, a Chinese woman living in Indonesia in the suburbs or living in the countryside. And the feeling that we get when we look at this is that the immigration judge and potentially the Board of Immigration Appeals was saying, you can move to another place. You weren't harmed. And again, they disregard the fact that here in the Ninth Circuit, you don't need to have physical harm. You don't need to be physically injured. You don't need to tell these great exaggerated stories to prevail in a case. And I believe that the immigration judges are starting to hear so much exaggeration. I hear so many incredible and implausible stories that when somebody like the petitioner comes, they're honest. They don't stand a chance. The IJ found her credible. He just didn't think the evidence was sufficient as a matter of law. So that's where the case is. How do you deal on the well-founded fear prong? How do you deal with the IJ's finding that her mother remained in Indonesia and went to church without harm? Here in the Ninth Circuit, as you know, the fact that a family member remains behind and may not be harmed is not fatal to a claim of asylum. Well, but it's a factor. It starts to make it very difficult under the extremely deferential standard of review to say that in combination with the other facts, it compels the conclusion to the contrary. The IJ's family remains in the native country unharmed. She testified that what was going on over there had never impaired her right to practice her faith. And then it goes through a long list of things indicating that there's just not a solid case here to suggest that she's going to be harmed if she goes back. Why does this record compel a different conclusion? Because she was there at that ground zero. And the fact that her mother or other family may be residing in Indonesia and have not experienced the same peculiar, specific facts that she did does not mean that she hasn't met her burden. Her burden is particularized to her and to her story and her life and her events. She was a supervisory person. She attained some degree of supervisory control in her job. She was still allowed to practice her religion. Her mother remained there unharmed. And all of that, still it's compelled. A conclusion to the contrary is compelled by that record? We would submit that, yes, it does. And if you take a look at what happened in her work and her employment situation, she was a female Chinese supervisor of many different Muslims. And she was put in a position where she may, on her own or because of circumstances, have been constructively dismissed because she was fearful of retribution because one of her employees was dismissed or left. And she had heard rumors and she had heard threats. Her mother didn't hear these rumors or didn't hear these threats. Other similarly situated Chinese women in Indonesia weren't specifically in that same position. And we would believe that a threat is enough, especially when coupled with the pattern in that she was in a great amount of fear in those three-day riots in Jakarta. When you put all of this together and you look at it, we believe that you don't need to have mayhem happen to you. You don't need to have been raped. You don't need to have had your serious bodily injury. And in this case, this certainly could amount to psychological torture of being confined in a space fearing rape for three days. Being in a position where you are aware that you're at work and you fear a threat and you don't believe that the police are going to protect you. You don't believe that the government is going to protect you. And the record itself and the documents submitted by co-counsel in this include the Department of State reports, include Amnesty International and other non-governmental organization statements. And the immigration judge went through and picked what he or she believed was relevant and disregarded the rest. And there is a few statements in the Department of State reports. And again, another reality of the trial courts in the immigration context is that a lot of the immigration judges feel that the Department of State report is wholly writ. And they will look and see that yes, there are some Christians, or yes, there are Chinese in Indonesia, and yes, they can practice a religion. But that is taken away and presented outside of the court. The petitioner was there. The petitioner experienced this. The petitioner testified credibly, consistently. How much of this kind of work is part of your practice? One hundred percent, and I'm a former prosecutor for INS. And so you, how often do these IJs make a, grant a petition for asylum? Does that never happen? It happens rarely. What does rarely mean? I would say that in my practice, and we present cases differently than other people, so I don't know what's happening. But let me say when I was a prosecutor for INS, I would say that maybe one in 50 cases would be granted. And those one in 50 cases would be when, you know, the facts were, and just gut-wrenching. And it is very, very rare for, in my past experience, to see something that is not gut-wrenching. It does happen. It does happen. We never see those cases. No, we never see those cases. So if you're sitting where we do, you think, well, it never happens. Then usually the government will waive appeal and join in with the judge. That's what happens. That's why these cases don't come up. That's what happens in our cases. All right, why don't we hear from the other side, and you can respond. Thank you, counsel. I'm Jennifer Parker. I represent the Attorney General in this case. I'd like to go over the standard of review, which is highly deferential, as you've pointed out, Your Honor. And it cannot be overturned unless the record evidence compels it. In this case, the record evidence simply does not compel overturning the decision below. Petitioner Simply has not experienced past persecution. She was never persecuted in Indonesia on account of any protected ground. What happened there was basically rioting. It was civil strife, which this Court has said is not, in and of itself, persecution. There was nothing ever directed at her. She did experience, apparently she was there while the riots were going on, but nobody in her family was ever harmed. Nobody that she knew was harmed, except maybe she possibly had a friend who her business was looted. Other than that, Petitioner did not experience any difficulties except having to stay in her house for three days, which does not rise to the level of persecution. If she'd been injured in the bomb blast, would your answer be different? Your Honor, no. The bomb blast, well, and I mean, it's clear that it's not just generalized rioting, because it's civil war. It's a, these are faith-based problems, religious problems, ethnic and religious. Well, Your Honor, it still required that the government was unwilling or unable to control them. I understand. You said, you categorized it as general mob violence, but it's more than that here. In fact, the I.J. said, well, this is, acknowledged that these were problems between ethnic and religious groups. Yes, Your Honor, they were, but I would also submit that this rioting affected everyone in Jakarta. Those who weren't protesting or out being part of the mob, who may not have been Chinese Christians, were probably also holed up in their houses. I mean, it's something that affected the entire city. While it was directed at Chinese Christians at some point, I mean, originally it appears that it was directed at the government for not doing something about the poverty level. And according to the country reports, the Muslims are poorer than the ethnic Chinese Christians, which is why they turn their anger against the ethnic Chinese Christians. But it does, it was a condition of general strife, and the fact that she wasn't, the immigration judge didn't focus only on the fact that she wasn't injured. It was a whole, he looked at several different factors, and one of the factors is that never been arrested, never been detained, never, there was no harm to any of her family. Her mother came to the United States and then went home and lives there peacefully. Petitioner has never had any trouble going to church. She was able to practice her faith. She had a supervisory position. Even after the riot, she went back to work. She did have a problem with one employee who apparently made a threat to her, and then he left and she never saw him again. I know opposing counsel argued she was constructively dismissed from her position, but the record does not support anything along those lines. She chose not to go back to work because she was afraid, and the immigration judge and the board both found that she was subjectively afraid of what was going on there, but again, that's not enough to show a well-founded fear of future persecution. It still has to be objectively reasonable, and the board and the immigration judge found that her fear was not objectively reasonable based on the country reports and the fact that her family remains there unharmed and her mother was able to return there and has not had any problems. Her mother would be a similarly situated person. She herself is an ethnic Chinese Christian. Her aunts are all there unharmed. It appears, at least in the city of Jakarta, that things are going fairly well for the ethnic Chinese Christians there. They're able to go to church and they're not being harmed. The government would submit that based on the evidence of record, there is nothing that would compel this court to overturn the decisions below. Thank you, counsel. Do you have any answers? I would just like to add that hopefully it won't get to a point where for a Chinese woman from Indonesia to be granted asylum, she must be injured, she must be raped. This court in Cote v. INS 31F3847, 9th Circuit, which is mentioned in the Petitioner's opening brief, has stated that the applicant is not required to show that she would be singled out individually for persecution. If there is a pattern and practice of persecution of groups of persons similarly situated, she can stay. Mr. Sandoval, would every ethnic Chinese Christian in Jakarta then be, in effect, automatically eligible for asylum, in your view? No. No. Well, then what would be the principal distinction between every ethnic Chinese Christian in Jakarta at the same time and your client? Well, we believe that, again, the distinction is how close are you to that ground zero. I'm saying everybody who lived in Jakarta at the same time who was a Chinese Christian woman, would they automatically be eligible for parole on your theory for asylum on your theory? I would say at least with respect to the second incident that happened in the church. Everybody in the church. Everybody in the church. Everybody that risked being killed when the church was being attacked and burned. And possibly anybody that has faced serious and credible threats regarding their an action that they have had that may be deemed inconsistent with the Muslim religion. As in this case, when she had the problem with her work. I see my time is up. Thank you very much. Thank you both. The case is argued as ordered and submitted. The court is adjourned for the week. All rise. The court is adjourned. Thank you.
judges: Trott, Rymer, Thomas